Mr. Gould, when you are ready, sir. Good afternoon, and may it please the Court. Andrew Gould for the Appellant Gregory Ratcliff. Ingram sent T.T. Barge a cleaning order for the 976, a 38-year-old barge. But Ingram's order did nothing other than summarily identify the previous cargo and authorize overtime work for a rush cleaning job in the largely unregulated barge cleaning industry. Now, the 976's cargo was not soybeans, like in Rose, the eastern district of Louisiana, case cited by the district court here, nor was it soybean milk, such as in this court's recent case in Johnson, which was a subject of the 28J letter. It was caustic soda, an extraordinarily dangerous and potentially fatal chemical. Yet despite this odorless and colorless chemical's hypertoxicity, Ingram did nothing else before turning over the 976 to T.T. Barge, which then sent an untrained, unprepared Mr. Ratcliff to clean caustic soda, which unknowingly extended to its ceilings. Based on Ingram's and T.T. Barge's negligent acts, Mr. Ratcliff suffered life-altering chemical burns throughout his body, requiring skin grafts and even esophagus surgery. On this record, Your Honors, genuine issues of material fact exist, precluding summary judgment. This court should reverse. And I'd like to begin, Your Honors, with the second issue here, which is even if you assume that Mr. Ratcliff is not a Jones Act seaman, consistent with what the district court held below, the district court nonetheless erred in granting summary judgment for Ingram under the Longshore Act. Now, the parties agree about what duty is at issue here. It's the turnover duty. The turnover duty entails two distinct but related obligations. First, the vessel owner must exercise ordinary care under the circumstances, that's a key phrase, under the circumstances, to turn over the ship in a condition such that a stevedore can carry on operations with reasonable safety. And second, relatedly, the vessel owner must warn the stevedore of latent or hidden dangers known to the vessel owner. So on the second point, I fail to see, or please direct me to evidence in the record that shows that this, the caustic soda and specifically the frozen soda, forgive me, I'm using the wrong terminology, but the frozen caustic that was on the ceiling, where's the evidence that that is latent? Because it seemed that everyone recognized, okay, it's up there on the ceiling. Respectfully, so Your Honor, I would direct your honor to Mr. Ratcliffe's testimony, and this is specifically at ROA 527. And when he says that when they began spraying the ceiling, he was surprised to see caustic soda falling from the ceiling. I'm not here saying, of course, that when they entered the barge that they didn't know there was caustic soda aboard. Yes, they did. The question, at least there's kind of two parts here. The first is, did he know what extended to the ceiling, right? And his testimony was that he did not. I recognize that Ingram may take a different view of it. When it's got to be latent, latent vis-a-vis whom? I'm sorry. Well, so in Manson-Golf, which is this court's opinion from 2017, there's a footnote, too, which I think is actually relevant to your question. And it talks about you have to view this from the perspective of the injured longshoremen. So I think you have to view it from here. It would be Mr. Ratcliffe's perspective. Did he know it was on the ceiling? But so when Ingram turns over, what is the number? 976, Your Honor. When Ingram turns over 976 to T.T. Barge to be cleaned, I mean, Ingram is not communicating with Ratcliffe, right? Correct. Ingram is communicating with the officials at T.T. Barge. Correct. So what is the substance of their communication with respect to the caustic soda? Very little, Your Honor. So there's kind of two parts of the communication. So first, at ROA 766, that's where you'll find the order. The order, it's a spreadsheet, and it encompasses both the 976 and some others. And that's where it says, it identifies the IB 976, says previous cargo, 50% caustic soda diaphragm. Doesn't say, doesn't provide any further detail. Then subsequent to that, there are communications back, I believe it's actually just one e-mail back and forth between T.T. Barge and Ingram. The testimony from this is at 606 and 607. And that's where they're talking about how we need this quick, we need this turned around. They do mention in these e-mails, there's a photograph attached, I believe, of the barge, and they identify that there's, I think, two inches of residue. But, again, there's no mention of it being on the ceiling. And I thought his supervisor or he, why do I think they saw it when they first entered? All they had to do was look up, right? Well, I mean, not necessarily, because, again, caustic soda, I mean, it's odorless, it's colorless. And critically for Mr. Ratcliffe, he had no experience in cleaning caustic soda. This was his very first time entering the barge to do that. And, again, that's what distinguishes this case from some of this court's other cases involving the turnover duty, where you have somebody who is experienced in this. He doesn't know anything about this. And so in this court's opinion in Randolph v. Lation, I might have mispronounced the defendant's name, so I apologize. But it's cited in our brief. What Randolph talks about is there's a distinction between the knowledge of the condition and the knowledge of the dangerousness of the condition. And, Judge Duncan, I was saying earlier in response to one of your questions, I had two points. And the two points here was that, first, I would dispute that he had knowledge of the condition, specifically as to caustic soda extended to the ceilings. But let's say you disagree with me and you say, no, because he could have looked up, he could have seen it, he did have knowledge of it. Did he know of the dangerousness of the condition? There is nothing in the record to show that he had any knowledge whatsoever of how dangerous this chemical was. But is that on Ingram or is that on T.T. Barge, his employer? So I think it's on both of them. But obviously with respect to the turnover duty, that's only going to be specifically as to Ingram. Wasn't there some evidence that he did see the frozen caustic soda on the ceiling when he entered the barge? I'm following up on Judge Wilson. I thought there was some evidence of that. So I did not read Mr. Ratcliffe's testimony in that way. And, again, I just keep going back to that one page in 527 from his testimony where he said he was surprised by it. Again, and I'm not here disputing that he didn't know that there was caustic soda generally aboard this barge. He did. But I do not think that the record shows that he specifically knew it was on the ceiling. As for what his counterparts knew, Mr. Poe, I'm forgetting the other person's name, we don't have in the record what they did or did not know. Is there any evidence that the condition of this, of 976, was unusual with respect to caustic soda? Because they obviously knew they were being asked to clean caustic soda. So that, no doubt, implies all sorts of risks that I'm sure everyone knows about, maybe not Mr. Ratcliffe personally, but the companies. So is there any evidence that this particular one had an unusual problem? I don't know. So the only, I would say, the only potentially unusual problem goes back to Mr. Ratcliffe's testimony where he said what he noticed was, his testimony was that it was a, quote, long overdue accumulation. In my introduction, Your Honor, I started by identifying this as a 38-year-old barge. It's not in the record when the last time the barge was cleaned for caustic soda. It's simply not in the record. And so I'd be speculating one way or the other. But what is in the record is his testimony where he says it's long overdue. But I think what, again, what distinguishes this case from this court's other turnover duty cases, again, Johnson, soybean mills, Hess, gasoline, Hill, wet, rusty tank walls, is caustic soda and how hypertoxic it is. You know, in Hess, this court said the danger inherent in removing gasoline and fumes from a barge was well known to all concerned. Fair enough. Nobody, I don't think anybody here would dispute that. You can't say the same thing about caustic soda. Maybe you can say that for somebody who is experienced in cleaning it. But Mr. Ratcliffe was sent there going inside. And so I think, Judge Wilson, you had asked earlier about who is this on. Is this on Ingram or TT Barge? And not to repeat myself, it is on both of them. They both violated their duties in different ways. Now, of course, whether or not the Jones Act applies to the Longshore Act will determine TT Barge's liability. But specifically as to Ingram Barge, it owed a turnover duty. And under the circumstances here, it should have done more. How was Ingram to know that TT Barge, just presume all this is your premise is correct, that TT Barge would send somebody with no experience to clean this barge? I'm sorry, Your Honor. Well, it seems like a lot of what you're emphasizing is that Ratcliffe had no experience doing this his first time on. How was Ingram Barge supposed to know that? Well, but I think, so I don't know. Does their duty rise if they presume or somehow have to find out that a crew coming on is going to be inexperienced? So I think this goes to the different feelings. And in our view, and again, we're at summary judgment, so what ultimately the fact finder might find whether or not this was reasonable or not will differ from summary judgment. But our point here is that there are certain things that Ingram could have done to mitigate against the potentiality for Mr. Ratcliffe being injured. Part of that, as Mr. Ratcliffe testified, was that at some prior jobs, Ingram would send a barge rep before they boarded the vessel itself. This was also considered— Is that the standard of care? It informs a duty to warn. And so I think under this Court's, I think it's Mann-Roland and Matter of Hot Energy, which we've cited in our briefs, those industry standards inform what their duty is. To be candid with the Court, those aren't Longshore Act cases, but they are about industry standards and how they inform a negligence inquiry, which essentially is what we're talking about even with the turnover duty. And so you can think about it here. Had they sent a barge rep to talk before they boarded the ship, they might have seen that Mr. Ratcliffe had no experience. They might have insisted on something else. Well, so that gets me to follow on Judge Wilson's point. Does the record reflect that the problem that Ratcliffe encountered here, what caused his injury, is the insufficient PPE? Ultimately, is that why he was hurt? I think that would certainly be at least one of the causes. What else? So I think it's also in terms of just the way that they sprayed the room altogether and what precautions they took aside from the PPE, was that sufficient or not? Well, it was dripping down on him, right? So it was dripping down onto him, creating puddles that he then, when he had his bigger injury, if you will, the second time was when he fell into the puddle. So I think there's part of it, which is the PPE component, but there's also just the general how the crew was treating this barge itself. But he was the only person injured, correct? We know that. As far as I'm aware, he was the only person who was injured. That's correct. So our point is simply that we would just urge this court to— I mean, in our view, again, this case is different because of the dangerousness of this condition and what Mr. Ratcliffe simply did not know. Does the record reflect how often T.T. Barge cleaned barges that had the caustic soda? Is that an unusual question? So I don't want to be misquoted, and I'm sure they'll come up and probably explain it better than me, but my recollection of the deposition testimony was that they did— or, excuse me, barges that had caustic soda with— I'm not sure with what regularity, but there was— you know, it did happen. If you actually look at the order on 766, there will be, I believe, at least one other barge that's identified with caustic soda. So, you know, as to the quantity, I don't know, and I don't believe it's in the record. But, again, it's just— I think we get back to kind of the first part of the turnover duty, which is under the circumstances. And we're not here saying that, for example, if this court were to reverse, that all of a sudden means that we go back and we prevail, and we're still going to have to prove our case. And the fact finder might ultimately find that Ingram did nothing wrong, but on this record, genuine issues of material fact exist. Can I ask a question about the semen issue? You didn't really address that. Sure. Just—and I don't want to take up too much of your time. On the substantial connection test under Chandra's precedent, do we look at all of Ingram's barges or just that one barge? So if we're talking about with Ingram, you can look at the fleet of vessels. As long as it's under common ownership, you can look at them all together, and certainly that's our argument. If we were just talking about the 976 and the 976 alone, we couldn't make an argument that he was a seaman for purposes of Ingram. It's the fact that he regularly cleaned—that Ingram barge was one of T.T. Barge's largest customers, and so under that common— So is there law—is there controlling authority that supports that proposition? So I believe—I cannot recall if it's Chandra's, but I'm coming back up for rebuttal, and I'll hope to provide that when I get up. Thank you. Thank you for the extra time, Your Honors. Thank you, counsel. Let's see. Mr. Gonzalez, you are for T.T. Barge, and you have nine minutes. Correct. Good afternoon, Your Honor. May it please the Court, Morgan Gonzalez and Aaron Greenbaum, on behalf of T.T. Barge Cleaning, Mile 183, LLC, and T.T. Barge Services, Mile 237, LLC. With respect to T.T. Barge, there are only two issues here. First, whether the work platforms at T.T. Barge's barge repair facility qualify as vessels under the Jones Act, and whether Mr. Ratcliffe qualifies as a seaman under the Jones Act. The answer to both those questions is no, and that's what Judge Jackson found on summary judgment when he considered the substantial jurisprudence and the 54 undisputed facts. For the record, as I refer to undisputed facts going forward, I'm referring to Record on Appeal Document 708-718, which is Mr. Ratcliffe's opposing statement of material facts in response to T.T. Barge's motion for summary judgment. Mr. Ratcliffe is a quintessential longshore worker. He drove to work every day. He only worked on docked vessels. He performed a discreet task of cleaning a customer barge, left the barge, and never saw it again. He did not even consider himself a member of a crew of any vessel, and that's undisputed fact number 58. And as Your Honors are well aware, the recovery under the Jones Act and Longshore and Harbor Workers' Compensation Act are mutually exclusive. For maritime employees, you're either a Jones Act seaman or a longshoreman, and Mr. Ratcliffe is clearly a longshoreman. The definition of vessel in the statute and in the case law recognizes that vessels that can potentially be mobile, potentially be moved, can qualify as a vessel. So here the barge could be moved. I recognize that a lot of effort would have to go into moving it, right? Right. So what is the best case that you can point to that would lead to our conclusion that that potential mobility of the dock doesn't make it qualify as a vessel? Your Honor, I would refer to the Lozman Supreme Court decision, which lays out the vessel test, but also to the Fifth Circuit cases, Ducrepont and Daniel v. Ergon. Both Ducrepont and Ergon involved repurposed barges that functioned as work platforms. And do those predate some Supreme Court cases? They do. Okay. So can we be confident that they're still totally good? Yes, Your Honor. I believe the Baker, the Fifth Circuit decision from 2016, which is post Lozman, applied the Ducrepont factors in considering whether a work platform qualifies as a vessel under the Jones Act. There's also district court decisions that are applying, especially the Ergon case, which followed Ducrepont. And even the Louisiana First Circuit in 2022 referred to the Ergon case in Jackson v. Chem Carriers. And that case actually cites another decision, Young v. T.T. Barge Services, Model 237, that found almost the exact same repair facility. They were not vessels and the worker did not qualify as a seaman as a matter of law. And to that point, the test from the Ducrepont case and Ergon is, first, it's threefold. First, whether the structures involved were constructed and used primarily as work platforms. While these weren't constructed as work platforms, they're decommissioned barges. They're not allowed to move by the U.S. Coast Guard. They're only allowed to be a dock and they only function as a dock. Number two, whether the structures were moored or otherwise secured at the time of the incident, that's not in dispute. These barges did not move, but on very rare occasions to accommodate repair or dredging, and that was years and years apart. And as Your Honor noted, it would be a massive undertaking to move them out of the way because they're connected by wires and walkways and steel cables connected to dead men and steel dolphins, keeping these work barges in place. Is there specific evidence in the record about how frequently they were moved? I believe there is either a declaration or testimony from T.T. Barge's corporate representative who testified that to his recollection there was one time within the past several years they had been moved to accommodate repairs after a vessel elision. But that's the only time he could think of in his deposition. I mean, this may touch on a different point here, but counsel for Mr. Ratcliffe emphasized the unusual danger of this particular job, cleaning the caustic soda. Is there evidence in the record as to – is this something that T.T. Barge often did, clean this kind of – undertake this kind of job, or was this an unusually dangerous job? I would say yes, but I would also – Yes, as to what? Yes, this was a typical type of job that T.T. Barge – they would clean caustic chemicals out of barges all the time. But T.T. Barge's motion for summary judgment did not touch on liability or those facts at all. Okay. Okay, no, that's fine. I understand that. But you're representing T.T. Barge, and I just – I mean, it's a barge cleaning company. Correct. And so Ingram's bringing – evidently Ingram's a repeat customer. I just was wondering, does the record reflect, oh, yeah, you know, every other week we get caustic soda? I can't answer that specifically, but my understanding is that's a regular time. Okay. Well, it's either in the record or not. And to move on to the next point that Mr. Ratcliffe's not a seaman, as Your Honors have mentioned before, the Chandra's case from the Supreme Court sets out the base test, which is two prongs. The first, that the worker's duties must contribute to the function of a vessel or to the accomplishment of its mission. Mr. Ratcliffe cannot satisfy this prong. And we would refer you to – or refer the Court to the Blompie AEP Elmwood out of the Eastern District, which held that a barge washer could not establish that his work contributed to the function of a vessel. But more importantly is Chandra's second prong, that the worker must have a connection to a vessel in navigation or identifiable group of vessels that is substantial in both its duration and nature. And, again, both of these prongs, it's an and, not an or. And the same thing with the duration. It's and – duration and nature. You know, this may not be a fair question, but, hey, I'll go ahead and ask it anyway. It strikes me from reading the papers in this case that the problem was that Mr. Ratcliffe didn't have the right PPE when he was cleaning this thing. Can you speak to the safety practices of T.T. Barge with respect to PPE? I'm not sure if that's even something you're prepared to talk about. I'm not really prepared to talk about that. And T.T. Barge doesn't face any liability directly if Mr. Ratcliffe is a longshoreman. And that's the only issue that was addressed in our motion for summary judgment. Yeah. I get it. He gets worker's comp under the LHWCA, right? Right. Correct. Would it have been unexpected or surprising to find frozen caustic soda on the ceiling of this container? I don't know. Is there any evidence in the record about that one way or the other? Not to my knowledge. I don't think it would be – but I don't want to speculate. I can't speak to what the record says on that. So there's nothing in the record? Is that correct? I really can't answer that one way or the other. I think Ingram's counsel would be able to answer that more effectively. All right. Okay. Thank you. Was he the first person on the barge to go in to clean? I don't think so. But I can't – again, I don't know that factual – Well, we're going by the record. So I'm asking you record. In the back of my mind, I thought his supervisor went on first or they were in there together. Because somebody pulled him back from it, didn't they? Yes. They cleaned the barge together. There was three of them is my recollection. And I don't know who came on first, but they all came on and worked together. Well, I thought there was some kind of spraying that was going on. Right. They had a term for it, but there was some kind of spraying that was going on. Presumably that was before he went in, but I'm not sure. That's actually – yes. I think it's called a butter – it's some type of machine that you put in ahead of time, and it sprays the whole barge basically, the inside. And then they went in and cleaned it. I think that's reflected in Mr. Ratcliffe's deposition. Well, that leads to the questions we asked counsel opposite. Didn't somebody look up and see it? Did he – did Ratcliffe look up and see it right at the outset on the ceiling? I would defer that to Ingram's counsel. I'm not prepared to say what the record speaks on as to that one way or the other because our motion only focuses on seam and stack. You're interested in – I understand. You're interested in the threshold issues. I get it. Correct. We'll ask the next counsel about those issues. Thank you, counsel. Thank you, Your Honor. Okay. Mr. Reisman for Ingram Barge, you have 11 minutes. Thank you, Your Honors. David Reisman with Lisco & Lewis on behalf of Ingram Barge Company. And I want to kind of jump right into some of the questions you all asked because I thought they were pretty insightful. I think so too. You're good at what you do. First off, there was some argument from Mr. Gould regarding the dangerousness of this cargo. And according to him, that sets this apart from the other cases. And I would suggest that's A, legally insignificant, but more importantly perhaps for right now, it's untrue. Because if we look at specifically the Hess versus Upper Mississippi case, that was a case where an individual was sent into a barge similar to this. That one, he was there to gas free it. So it had a cargo of gas in it. There were vapors in there. Those vapors exploded. The barge exploded. The plaintiff was severely burned. That was obviously clearly very dangerous, probably more dangerous than caustic frankly. Yet the court still applied that same 905B analysis to reach the conclusion that Judge Jackson reached below in which we would argue is the correct conclusion here. So I think that's something we would like to start with. In terms of some of the other points that have been raised regarding the latency, I think Judge Duncan, you asked about the latency issue. And you were spot on correct. In fact, at record on Appeal 527, Mr. Ratcliffe was asked, so when you got inside the barge, you saw that there was caustic on the roof of the barge, on the underside of the ceiling of the barge, and it was dripping. And his answer was yes. This wasn't a latent defect. And if we compare that testimony specifically to the Manson Gulf case that was cited repeatedly by Mr. Ratcliffe . . . Those, the holes in the deck . . . Exactly. It was a hole in grating. There was actually a photo included in that opinion to show you just how difficult it was to see the hole. Unless you were standing right over it looking down, you wouldn't see the hole. So that's a significant distinction. That's what a hidden and latent defect is. One that somebody can look up and see it is not hidden. It's not latent. Instead, it's open and obvious. And I think this might go to Judge Schrader. I think you were the one that asked the question, was it unusual to find caustic on the ceiling of these barges? And I don't think other counsel was prepared for that issue, but fortunately I am. And the answer is, it's totally typical. So much so that Ingram routinely sent barges with caustic, and this is in the record. T.T. Barge testified in their corporate deposition that it was a routine matter for them to clean caustic barges. But more directly to Judge Schrader's point, they had a procedure in place to clean caustic off the ceiling of the barges. And this, of course, is all included in the record before the court. They used a machine called a Butterworth. They attach this machine. It's got hoses that come down inside of the barge and spray it. They spray usually hot water or steam, sometimes cold water. And they specifically testified in their deposition that we use that to get the caustic off the ceiling. That is not an uncommon condition to find. And again, that's in the record. Go ahead. So is it the very reason that this Butterworth is in there, because it's on the ceiling? Or is it because it's everywhere? I think, to be fair, I think it's because it's everywhere. It was on the ceiling. It was also on the walls. And again, I know there was a question about who was the first person in the barge. Mr. Ratcliffe was not the first person in the barge. The first step that's performed here is that a representative of T.T. Barge goes in the barge, and they look. They inspect it, and they take photographs, because they have to determine how much they're going to charge their customer to perform this work. So it's incumbent upon them to determine where is this caustic, how thick is it, what's it going to take to clean it, because they set a fixed price. They send a photograph of the inside of the barge with that price to their customer to get approval to perform the work. And all of that happened in this particular case. Then on top of that, Mr. Henry, the barge cleaning foreman, was the first one in the tank. He went in there, and he started the process of washing it down. I think this is something significant that Mr. Gould perhaps omitted, which is that when the caustic came in on that barge, it wasn't frozen. It was actually dried, but frozen was the term that's been used throughout the case. It was dried on the walls and the ceiling of the barge. What T.T. Barge did, not Ingram, but what T.T. Barge did was they put this Butterworth in, and they started spraying it to try and blow it off of the ceiling and the walls. Then they went in with hoses, including Mr. Ratcliffe, and they started continuing to spray it. What Mr. Ratcliffe said is the reason it was dripping off of the ceiling was because one of his coworkers, the barge cleaning foreman, was spraying it and causing it to drip. All those were conditions that were not created by Ingram. They were created by T.T. Barge crew, but more importantly, those are common conditions that a barge cleaning crew encounter on a regular basis or a routine basis, to use the words that T.T. Barge used, and in something that's a completely customary practice. Caustic, now I think I want to address Judge Duncan, your question about the PPE, because frankly, that is what this case is about. Mr. Gould suggested that Mr. Ratcliffe didn't know that this was dangerous stuff. He was a novice that was thrown into this issue. I'd start off by saying, well, if that's true, that really goes to the point that the Supreme Court pointed out to us in the Howlett case where they said that in these situations, it's the stevedore, the employer that has the best knowledge of who their people are and what they know and how to do the job safely and what precautions they have to take. It's the stevedore, not the employer that should have that liability. If we look at, it's the Hill versus Texaco case. Individual is working inside a tank of a ship. He climbs up some rails on the inside of the tank. There's rust on the side of the tank that he's there to actually identify and quantify, and he slips and he falls. One of the claims was that he didn't have fall protection. What the court said there was, well, that's the employer's obligation. They've got to provide that, not the vessel owner. It's the same thing here. The issue was PPE. If he had had the proper PPE, just like Mr. Poe, his co-worker, and Mr. Henry, the other co-worker that were both in that tank, we wouldn't be here today. The party charged with the responsibility to provide that safety equipment is not Ingram, the owner of the barge. It's the employer, the stevedore, the barge cleaner, TT Barge. I think your questions were right on point here. That's what this is about, and Ingram doesn't have that liability. I heard a reference to a team that Ingram would sometimes send, a team that would sometimes send with respect to these kind of jobs. Is there anything in the record about that? I'm not sure. Yeah, a team, some kind. Mr. Gould referenced, I don't know if it was an advanced team or a clean team or something like that. Or a barge rep. Yeah. Barge rep, that's what it was. That's what I thought. That was one of the arguments that they've made is that Ingram somehow should have had somebody out there. But Mr. Gould slipped up, I think, when he discussed that issue and he said, it goes to what? The duty to warn. What we know from all of the case law, at the Supreme Court level and at the Fifth Circuit level and at the district court levels, including cases that have dealt with almost identical issues is . . . I've lost my train of thought and I apologize. It's the duty to warn. The barge rep. It goes to the duty to warn. There is no duty to warn if the condition is open and obvious. Again, here, that latency issue that Judge Duncan raised, looking up and seeing the condition on the ceiling is not hidden. It's not latent. It is open and obvious and that negates the duty to warn. Their argument that we should have had a barge representative there, that goes out the door along with that. The same thing when they said we should have conducted a JSA. Well, again, the Supreme Court has told us, no, that's the employer's duty, not the vessel owner's, but regardless, that goes out the window as well if the condition that's being complained of is something that's open and obvious. Again, here, not only did Mr. Ratcliffe see it, but I think more importantly, to the extent dangerousness and his awareness of that is important to the court, I would say the fact that Mr. Ratcliffe, in July, in South Louisiana, inside the tank of a barge, knew that he had to put on a slicker suit, a jacket, rubber jacket and rubber pants, sealed at the wrists and ankles, with a full face respirator on him. I'd tell you that pretty much confirms that he knew this stuff was dangerous and he didn't want to get it on him. He had that knowledge that he didn't want it on him. He had the knowledge that it was there. He had the knowledge that it was on the ceiling. At the district court level, the argument was, well, he didn't know that it was frozen. Well, Judge Jackson rightfully said, well, that's nonsensical because he testified when he walked in it was frozen and he saw it. Now, they've changed that argument. Oh, no, we don't mean that. We mean he didn't know it was on the ceiling. Well, again, Record 527 shows us that he walked in the barge, he looked up and he saw it on the ceiling. An hour and a half before, by his own testimony, an hour and a half before the first drop touched him, he knew it was there. Under those facts . . . . . . I noticed there was a distinction between frozen and was it frozen or was it on the ceiling. Is there a waiver issue lurking here? Was this argument that it was on the ceiling and hidden made? I'm reluctant to make that argument generally speaking, but it certainly occurred to us because the argument very clearly at the district court level was that he didn't know that it was frozen. Somehow, that changed it. He knew it was causing, he knew it was frozen. I will leave that to the court. I don't think we need to get to that point, frankly, because I think the openness and obviousness of it eliminates any of the arguments that they might have. He knew it was there. He knew it was dangerous. He knew he needed to be protected from it. All of those are obligations that belong to the employer by the authority of the Supreme Court and this court. We have not seen a single case that would deviate from that. Any other questions? Well, counsel, you have 34 seconds left. Do you have anything else for us? I'm going to cede my time. Okay. We'll take the 26 seconds back. Thank you very much. Mr. Gould, you have five minutes for rebuttal. Thank you. Just a few discrete points in response to some of the other points that were made. First, actually, though, Judge Schrader, I owe you an answer to your question. It's the Harbor Tug v. Popeye case from the U.S. Supreme Court that refers to the substantial connection to a vessel or a fleet of vessels. I think the facts are very important, so let's talk about the ceiling point. First off, I want to make, and maybe this distinction, I didn't make this part of the turnover duty is about what happens before the person even enters the ship. Here, my friend opposite me is correct that Mr. Ratcliffe did testify that when he got inside, he saw it dripping from the ceiling. But my point is that he didn't know beforehand that it was coming from the ceiling. In fact, how could he? We have, and this is from the e-mails back and forth between T.T. Barge and Ingram, this is at 604, where they talk about two inches per tank, and he refers to the quantity of caustic residue, quote, laying across the cargo tank floor, and that wasn't stripped off or drained in the cargo pump at its last discharge. We're talking here about the floor, not about the ceiling. He didn't know, and so their duty was breached at the moment he set foot inside of the vessel itself. What of counsel opposite's point that seems logical to me that T.T. Barge had to send out a crew or somebody onto the barge to assess what kind of job it was and to take pictures and to price it? Our response, Your Honor, is that under the circumstances here, they had to have a crew. So I don't want to repeat myself but getting back to the Hess case, which my friend talked about, again, yes, we're talking about gasoline fumes. I'm not disputing that gasoline fumes are not dangerous, but again, as this is unsupported by the record, and I'd refer to 509 through 11, 519, 523, 573 to 75, where Mr. Ratcliffe repeatedly testifies that he was untrained on how to do this. And so just merely the fact that he was putting on a company-provided slicker suit doesn't mean that he knew about the dangerousness of the condition. And again, they're free to argue this to the trier of fact that, of course, you know, this shows that we acted reasonably under the circumstances. But at summary judgment, that's not enough. And so unless the Court has any questions, you know, I just close with this line from Manson Gould from Judge Reveley, and he says, in reversing summary judgment, he says, judicial efficiency is a noble goal to be sure. But when an evidentiary record contains a material factual dispute, as this one does, we simply cannot bypass the role of the fact finder, whoever that may be. Summary judgment was improper. That's what we're saying here. On this record, when you look to the turnover duty and the two distinct but related obligations, under the circumstances here, there are genuine issues of material fact for a fact finder to determine. And all we are asking for is our chance to present that claim to the fact finder. Thank you, Counsel. Thank you, Your Honors. Thank you for a well-argued case all around. The case is submitted.